## REUBEN FISHER *v.* THE STATE.

1. CRIMINAL LAW *Indictment. Murder.* The word *wilful* is included in the words maliciously, deliberately and premeditatedly.

2. SAME. *Murder.* "Maliciously," and "malice aforethought," in our criminal law are used interchangeably and signifies the same thing.

3. SAME. *Same.* If the deceased had previously received a mortal blow, if the last blow by the defendant hastened his death, he would be guilty of murder, if the other elements existed.

4. SAME. *Same.* Whether secs. 4928–9–30 of the Code change the common law is not determined, but the opinion is expressed by McFarland, J., that in a case to which the statute is applicable, a person would be excused for acting upon well-grounded apprehensions—as in case of self-defense.

5. SAME. The failure of the record to show the appointment of Attorney General *pro tem.*, is cured by the Code, sec. 5242, sub-sec. 8.

### FROM SMITH.

Appeal in error from the Circuit Court of Smith county.   N. W. McCONNELL, J.

J. J. TURNER, E. L. GARDENHIRE and T. J. FISHER· for Fisher.

JORDAN STOKES, J. J. FORD and ATTORNEY-GEN- ERAL LEA for the State.

MCFARLAND, J., delivered the opinion of the court.

The defendant was indicted jointly with John Ben- ton Fisher for the murder of S. W. Lamberson (known in the record as "Stock" Lamberson), in Smith county. The defendant· was separately tried and convicted of murder in the second degree and sentenced to ten. year's imprisonment in the penitentiary, and has ap- pealed in error from the judgment.

The homicide occurred in July, 1881, at or near· a saw mill in Smith county, where a large number of persons were attending a trial of causes before a justice of the peace. The defendant went to the place in company with John Benton Fisher, who was his second cousin. Another brother of the defendant, Landa Fisher,. was along, and perhaps one or two others. They ob- ·tained whisky and were drinking during the afternoon. The deceased and Ira Lamberson, his brother, were also upon the grounds, and in their company others of their friends. There is some proof of previous hostility between the parties growing out of the killing of a dog, but not of a very positive character. On the other hand there is evidence tending to show that the parties were friendly shortly before the killing, and what- ever bad feeling may have existed had died out. With- out undertaking to set out all the circumstances attend-

ing the homicide, the following summary will be sufficient
The defendant was sitting on a pile of loose plank
with others near him, when he hallowed, or in the
language of some of the witnesses, gave "a whoop,"
making some remark about his whisky being out, not
necessary to repeat.   Soon after, John Benton Fisher
came walking down from the direction of the mill
shed with an ax handle in his hand, and said, "I am
the best man in the kit," or some similar language, or
in the language of other witnesses that "he could whip
any man on the ground except his friends."   It is
claimed by the State that these remarks were directed
at Ira Lamberson, who was near by, and were made
in an insulting or boasting manner.   For the defend-
ant it is insisted that the remarks were in a jocular
manner, and not intended to give offense.   At all events,
Ira Lamberson ";took it up," and, according to the
State's witnesses, asked if these remarks were intended
for him, and the defendant, without waiting for Benton
Fisher to reply, answered, "yes, he does!"   This
is denied by the defendant, who maintains that Ira
Lamberson at once and without more, replied in a de-
fiant and insulting manner, and started towards Benton
Fisher, when he was caught by two of his friends.
It is agreed, at all events, that these two parties were
making hostile demonstrations towards each other when
the deceased came between them and approached Benton
Fisher.   It is claimed by the State that he was act-
ing as "peace maker," and attempting to prevent a
difficulty.   For the defense it is insisted that he made
an assault on Benton Fisher, or was attempting to
do so, with a knife.

At any rate, all the testimony agrees that Benton Fisher struck the deceased with the ax handle, knocking him down.  About this time Ira Lamberson released himself from those who were holding him, and rushed on Benton Fisher, throwing one or more rocks at him, and according to defendant's proof, throwing one rock at defendant.  About this time, as other proof for the State shows, the defendant told Benton Fisher to draw his pistol and shoot.  For the defendant it is insisted that he was protesting that they wanted no· difficulty, and telling the other party to stand back.  All the proof shows that Ira Lamberson pressed upon John Benton Fisher, who drew his pistol and began firing at him and retreating backwards, pursued by Ira Lamberson.  John Benton Fisher, finally after retreating about thirty yards fell, and Ira Lamberson fell or jumped on him and attempted to stab him with a knife, which, however, broke.  In the meantime, while the fight between Benton Fisher and Ira Lamberson was in progress, the deceased, who as we have seen, was knocked down by John Benton Fisher, got up, according to the proof for the State, after several efforts, and went on down the road in the same direction of the two parties engaged in the fight.  The most of the witnesses for the State say he seemed to be "addled," and was staggering or going half bent, as if he had not recovered from the blow.  While in this condition, and taking no part in the fight, the defendant came up to him and struck him on the side ·of the head with·a hand-spike, knocking him down. The defendant then went to where Ira Lamberson

and John Benton Fisher were fighting and stabbed Ira Lamberson twice in the back, after first attempting to strike him with the hand-spike.

For the defendant it is insisted that he struck the deceased after he stabbed Ira Lamberson, or at all events, that when he did strike, deceased was assaulting him and also Landa Fisher, his brother. The hand spike with which the blow was given, is described as four feet eleven inches in length and two and a half inches in diameter at one end and three inches at the other, of seasoned iron wood and weighed seven pounds. The defendant struck with both hands, deceased never rose after being knocked down the last time, and died at 10 o'clock the same night, his skull was badly fractured. There were two wounds on his head. The first was severe, and the physicians say, might have proven serious. The other was necessarily fatal, and the physicians say it was remarkable that it did not produce instant death. The latter was no doubt produced by the blows given by the defendant. This outline will suffice to present the various questions made upon the judge's charge.

1st. It is assigned as error that in one portion of the charge in defining murder in the first degree, the word " wilfully " is omitted, though the other words of the definition are all given. To this there are several answers: First, when the context is considered the word is not omitted. Second, it is included in the words maliciously, deliberately and premeditately, as a deliberate and premeditated killing must of necessity be wilful; and third, the defendant was acquitted of mur-

der in the first degree and could not have been injured by the charge if erroneous.

2d. In defining murder in the second degree the judge uses the word "maliciously" instead of "malice aforethought." Whether or not there be any difference in the exact meaning of the terms, they are used in our criminal law interchangably and signify the same thing as we have several times held.

3d. That in defining involuntary manslaughter, the judge said "where it *clearly* appears that neither death or great bodily harm was intended," etc. This, it is argued, deprived the defendant of a reasonable doubt in deciding between that grade of offense and the one next higher. This, however, is fully stated in other portions of the charge, and besides, there was no proof raising a question as to involuntary manslaughter.

4th. The court instructed the jury that if the death of the deceased was caused by the joint effect of both blows, the one inflicted by John Benton Fisher and the one inflicted by the defendant, then both would be guilty, regardless of whether they were acting in concert or in pursuance of a previous conspiracy or row. There is at least no error in this against the defendant. He struck the last blow, and if the deceased had previously received a mortal blow, or whether mortal or not, if the last blow hastened his death, or caused his death by reason of the condition deceased was in when he received the last blow, the defendant would be guilty, if the other elements of murder existed.

5th. In charging upon the law of self-defense, the

Fisher *v.* The State.

judge told the jury that the defendant could not be justified in using more force in repelling an assault than was necessary.    It is argued that this deprived him of the right of acting upon reasonable and well grounded apprehensions, but it is impossible, in view of the other portions of the charge, so full and clear upon this subject, that the jury could have been misled.    The charge must be taken as a whole, and one clause or sentence must not be disjointed and read without the context.

6th.  Further, upon the law of self-defense, the judge uses this language:  " The whole doctrine is founded upon the idea that the defendant is in no wrong in bringing on the difficulty.    If he is himself the aggressor, or has provoked the difficulty, he must decline it or offer to decline, and do all in his power to decline before he can fight in self-defense.    He must abandon his conflict in good faith, and by words or acts, or both, reasonably indicate to his antagonist that he has thus abandoned it so that his antagonist is put wholly in fault for continuing the conflict before he can fight in self-defense."    It is argued that this means that if the defendant may use insulting or provoking language, and in consequence the deceased attacked him, the defendant could not fight in self-defense.  That this is not the meaning of the charge is shown from other portions of it in which his Honor instructs the jury, that mere words, however insulting, do not justify an assault; and further, when he comes to charge directly upon the facts of the case, he shows that what he means by defendant being in fault in

provoking or bringing on the difficulty, is that he must either himself make the attack or intentionally provoke his antagonist to attack him, and if he in this way purposely create the necessity for slaying his adversary, he cannot claim that he slew him in his necessary self-defense, and this is sound law: *Ripley* v. *State*, 2 Head, 217.

7th. It is insisted the court erred in regard to the right of the defendant to kill the deceased to prevent him from committing a felony upon John Benton Fisher. The judge charged the jury in substance, that the defendant had the right to fight in defense of himself or his brother, and to slay the deceased if necessary, in their defense; and further, if in slaying the deceased, he acted upon the honest belief that his own or his brother's life was in immediate· peril, and the slaying was then necessary, and this belief was reasonable and well founded upon the circumstances as they then appeared to him, the defendant would have the right to act upon these appearances; but as to John Benton Fisher, who was defendant's second cousin, the defendant had no more right to fight for him than for a stranger; nevertheless, upon a construction of sections of the Code, 4928, 4929 and 4930, his Honor said to the jury that if the deceased was about to kill John Benton Fisher, or do him some great bodily harm, and if necessary to prevent it, the defendant might stab and kill the deceased. But to justify him in this, the danger to John Benton Fisher, must have been actual. The defendant could not in this, as in defending himself or his brother, act upon a well grounded apprehension.

The sections of the Code referred to are as follows:· 4928, "Lawful resistance to the commission of a public offense may be made by the party about to be injured, or by others." 4929, "Resistance sufficient to prevent the offense may be made by the party about to be injured. First, to prevent an offense against his person. Second, to prevent an illegal attempt by force to take. or injure property in his lawful possession." 2930, "Any other person in aid or defense of the person about to be injured may make resistance sufficient to prevent the offense."

It is argued for the defendant that these sections allow any one, in order to prevent the commission of a public offense against the person of another, to offer such resistance as will prevent the offense even to the taking of life, even though such other person be a stranger in blood, and in effect breaks down all distinction in this respect between strangers and kindred; and further, in such cases a person may act upon appearances—as in case of self-defense. We do not deem it necessary to undertake a construction of these sections or to determine how far, if at all, they change the common law. We are not prepared to say that his Honor's construction is correct. We are inclined to the opinion that in a case to which the statute is applicable, a person would be excused for acting upon well grounded apprehensions—as in case of self-defense. It is sufficient, however, for this case, to say that we find no evidence in the record raising the question. We find no evidence in the record, that at the time the fatal blow was stricken, the deceased was about to

commit any offense against John Benton Fisher. He was not assaulting or offering to assault him. The defendant's proof, so far as it tends to show, that the deceased was attempting violence against any one, is to the effect that he either assaulted the defendant or his brother, Landa Fisher, and the charge of the judge concedes to the defendant all the right of defending either himself or his brother Landa, that in this respect is claimed. The only complaint on this point is that the same right is not conceded to the full extent in defense of John Benton Fisher, and as we have seen, there is no proof that deceased was about to commit any offense against John Benton Fisher, or that there was any appearance of such an attempt. If it be conceded that he assaulted him in the first instance, the deceased was not following it up. There being no proof on the subject, the error, if one, could not have injured the defendant.

It is next objected that the judge, in charging upon the facts of the case summed up the facts against the defendant, omitting those in his favor. The only foundation for this criticism is, that the judge told the jury that if there was an old grudge and the defendant had made threats against the deceased, they should be looked to in connection with the other facts, but did not call the attention of the jury to the proof in regard to the reconciliation and friendly feeling between the parties shortly before the difficulty. But he did tell the jury that if there was an old grudge and a new provocation, the law would rather attribute the killing to the new provocation. We do

Fisher *v.* The State.

not think the omission of the judge to refer to the proof in regard to the reconciliation and friendly intercouse between the parties, sufficient to authorize a reversal.    The defendant's counsel submitted a number of requests to charge, and if this had been embraced it would no doubt have been given.

Defendant's counsel submitted eleven propositions which they requested the judge to charge.    The judge responded as follows: "Upon the first eight propositions I think I have charged you sufficiently, but they are correct propositions of law and I give them in charge."    It is argued that the judge weakened the effect of these propositions by saying that he thought he had charged sufficiently upon them, when, in fact, he had not.    There is nothing in this.    The propositions were broadly given and this was all the defendant could ask.    The eleventh proposition was given, and upon the ninth and tenth he declined to charge further, and we find they contain nothing material not included in the general charge.

The objection that the record does not show the appointment of the attorney *pro tem* who signed the indictment, is cured by the Code, sec. 5242, sub-sec. 8. Finally, it is earnestly argued the verdict is not supported by the evidence.

We are not inclined to think that the killing resulted from an "old grudge," it was rather from a sudden quarrel and the fight between the parties.    But the weight of proof is undoubtedly against the plea of self-defense or a killing in defense of the defendant's brother, Landa Fisher.    Under these circumstances, the

11—VOL. 10.

use of the hand-spike described in the proof by the defendant—a man proved to weigh about one hundred and sixty pounds—and using both hands, striking the deceased, a smaller man, and at the time exhibiting no arms, and in fact having none, a blow with such deadly force and effect, raises a very legitimate inference of malice, and we see no evidence of provocation offered by deceased, which in law can be deemed evidence to reduce the killing to manslaughter.

We are, therefore, constrained to hold that there is no error in the record, and affirm the judgment.